**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                 No.  CR-02-2277 MV

CHARLIE TOM, JR.,

     Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on Defendant 's Motion to Suppress Statements and Memorandum in Support **[Doc. No. 78]**, filed June 14, 2004. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

<u>**BACKGROUND**</u>

On the evening of August 28, 2002, Navajo Nation Police Officer Sheila Antonio was called out to the home of Heidi Begay, Defendant Charlie Tom, Jr.'s girlfriend.  Ms. Begay was at the hospital after having given birth to a baby.  She arrived at the hospital with a placenta but with no baby.  Later that night, FBI agents sent Officer Antonio to Defendant's house.  Officer Antonio arrived at Defendant's house some time between 10:30 p.m. and 11:00 p.m.  She was dressed in her uniform.  Defendant was sleeping.  His sister woke him up and told him that Officer Antonio wanted to speak with him.  Officer Antonio testified that she informed Defendant that Heidi Begay was in the Intensive Care Unit at the hospital in Gallup and asked if he knew anything about it; Defendant replied that he did not.  Officer Antonio told Defendant, "We would like to talk to you.  There is a

criminal investigator at Heidi's house. We're going to take you back over there." Defendant replied, "Okay."

According to Officer Antonio, she asked Defendant if he wanted to ride with her and he said, "Okay." Defendant offered conflicting testimony as to whether he asked Officer Antonio if he could ride with his parents to the Begay residence and as to Officer Antonio's response. At first, Defendant testified that he decided to go with Officer Antonio rather than ask if he could go with his family because he "felt like" she did not want him to go with his family, although she did not say that she did not want him to go with his family or that he was not allowed to go with his family. Upon further questioning, Defendant testified that he asked Officer Antonio if he could ride with his parents and that she told him, "No, you have to go with me."

After his initial discussion with Officer Antonio, Defendant went inside his home to let his parents know where he was going, came back outside with a jacket and got into the front passenger seat of Officer Antonio's patrol car. Defendant's parents followed them to the Begay residence in their own car.

Officer Antonio testified that she told Defendant that he was not under arrest, that he was not being detained and that she was taking him back to Ms. Begay's house in order for Criminal Investigator ("CI")Robert James to ask him a few questions. Officer Antonio testified that she did not threaten or attempt to intimidate Defendant in order to convince him to accompany her. Defendant was not handcuffed and Officer Antonio did not engage her lights or sirens. Officer Antonio further testified that, at the time, Defendant was a witness rather than a suspect.

Officer Antonio did not ask Defendant any questions during the ride. When they arrived at Ms. Begay's house, CI James asked Defendant to sit and talk with him in his police vehicle.

Defendant sat down in the front passenger seat.  CI James testified that, at this point, Defendant was a witness rather than a suspect.  CI James and Defendant discussed Ms. Begay, her pregnancy and the relationship between Ms. Begay and Defendant.  CI James did not instruct Defendant to stay but also did not tell him that he could leave.  After approximately twenty minutes, CI James asked Defendant to wait in his parents' car until FBI Agent Ben Bourgeois arrived.  Thereafter, Defendant waited with his parents in their car until Agent Bourgeois arrived and was ready to interview him.

Officer Antonio testified that, if Defendant had attempted to leave with his parents before Agent Bourgeois arrived, she would have stopped him.  CI James testified that he would have let Defendant leave if he had attempted to do so.  Defendant testified that both Officer Antonio and CI James told him to stay in order for the FBI to question him.  Further, Defendant testified that at no time while he was in Officer Antonio's vehicle or in CI James's vehicle did he feel that he had a choice to leave.

Agent Bourgeois testified that he had interviewed Ms. Begay, who told him that she had given birth to a stillborn baby.  Based on Ms. Begay's statement, Agent Bourgeois thought Defendant might have been a witness to the stillborn birth. Agent Bourgeois testified that, when he arrived at Ms. Begay's house, he, CI James and Officer Antonio processed the scene for approximately one and one-half hours.  Agent Bourgeois further testified that, thereafter, some time between 11:30 p.m. and midnight, he, CI James and Officer Antonio asked Defendant if they could speak to him.  According to Agent Bourgeois, Defendant said, "Yes," he exited his parents' car and they all went inside the house and sat down at the kitchen table.  Agent Bourgeois testified that he and CI James were in plain clothes, that he had his weapon but did not display it and that he told Defendant that he was not under

arrest.  Agent Bourgeois also testified that Defendant would have been free to leave at any point during the interview.

Agent Bourgeois explained to Defendant that they needed his assistance to figure out what happened to Ms. Begay's baby.  Agent Bourgeois read Defendant his *Miranda* rights.  According to Agent Bourgeois, Defendant asked no questions about the waiver of rights, seemed to understand what Agent Bourgeois read, appeared lucid and aware and maintained a calm, unemotional demeanor throughout the interview.   According to Defendant, he did not understand that he had the right to have a lawyer appointed.  Specifically, Defendant testified that he thought he was required to hire a lawyer himself and that, because he had no money to hire a lawyer, he felt that he "just had to sign it and go along with the questions they asked."

Defendant signed a waiver of rights form at 1:40 a.m.  Thereafter, Defendant stated that, on the previous day while he was at Ms. Begay's house doing homework, Ms. Begay went into the bathroom and gave birth on the floor to a dead baby.  Defendant also said that he took the baby and left it up on the hill.  According to Agent Bourgeois, he asked Defendant to show them where he took the baby and Defendant responded, "I'll take you there."   According to Defendant, Agent Bourgeois told him that they could not let him go until he showed the agents where he put the baby and, for this reason, Defendant said, "All right."

Defendant escorted the agents up the hill and, from approximately fifteen away, pointed out the location where he left the baby.   Agent Bourgeois testified that he told Defendant that he could go back to where his parents were waiting in their car.  Agent Bourgeois, CI James and Officer Antonio continued on to the location pointed out by Defendant and found a plastic bag with a baby inside.  They decided to leave the bag where it was until someone from the Office of the Medical

Investigator ("OMI") arrived at the scene.  The agents returned to Ms. Begay's house and informed Defendant that he was free to leave.  Agent Bourgeois testified that, at that point, the evidence was consistent with the story that Defendant and Ms. Begay had told him, *i.e.*, that the baby was stillborn. Specifically, Agent Bourgeois testified that nothing in Defendant's demeanor raised any suspicion that he was being deceptive or dishonest.

Upon arrival, the investigator from the OMI opened the bag but then decided to replace the body in the bag and have an autopsy performed to determine the cause of death.  At approximately 9:00 a.m. the following day, August 29, 2002, Agent Bourgeois met with Ms. Begay, informed her that an autopsy was going to be performed and asked whether there was anything else that she needed to tell him about the cause of death.  Ms. Begay told him that the baby in fact had been born alive and that it moved and cried upon birth but that it died minutes later.  That afternoon, at approximately 1:30 p.m., Agent Bourgeois and CI James approached Defendant, who was in a waiting room at the hospital with his parents visiting Ms. Begay. Agent Bourgeois testified that he and CI James asked Defendant if they could speak with him again to clear up some of the facts regarding the baby. According to Agent Bourgeois, he told Defendant that he was not under arrest and was not being detained but that the agents wanted to question him in private.  Agent Bourgeois told Defendant that he needed to tell them the truth this time and indicated that he did not believe that Defendant's first version of the events surrounding the baby's birth and death was truthful.  Agent Bourgeois did not advise Defendant that he was free to leave.  According to Defendant, he felt that, if he had tried to leave, the agents would have stopped him.

Defendant agreed to go with the agents to another waiting area where there was more privacy.  Agent Bourgeois read him his *Miranda* rights.  Defendant did not ask any questions about

his *Miranda* rights and signed a waiver of rights form.  Agent Bourgeois testified that he told Defendant that an autopsy was going to be performed and that it was time to bring forward any information that he had not yet provided to them.  Defendant told them the same story that Ms. Begay had told them, *i.e.*, that the baby was born alive, that it moved and cried, but that it died a few minutes later.  Agent Bourgeois testified that Defendant's demeanor was calm, cool and collected, his voice was unwavering and he did not show much emotion. Further, Agent Bourgeois testified that he believed what Defendant told him.  After the interview, the agents left the hospital.

The next day, August 30, 2002, an autopsy was performed on the baby.  Agent Richard Donagee, who was present during the autopsy, notified Agent Bourgeois that the OMI had determined that the cause of death was numerous lacerations to the throat which severed most of the major arteries and veins.  Agent Bourgeois approached Ms. Begay again.  During this interview, Ms. Begay stated that she had given birth to the baby on the bathroom floor and that both she and Defendant were nervous and scared because her mother had warned her not to get pregnant.  She further stated that, upon giving birth, she said to Defendant, "I don't know what to do.  Do something with it.  Kill it."  Ms. Begay told Agent Bourgeois that Defendant then went into the kitchen, came back with a knife and lacerated the baby's throat.

After hearing Ms. Begay's story, Agent Bourgeois contacted CI James and Special Agent Marcus McCaskill and asked them to come with him to interview Defendant again.  Agent Bourgeois, CI James and Agent McCaskill went to Defendant's house, where they found him outside with a group of people.  Agent Bourgeois told Defendant that they needed to talk to him and asked if there was somewhere they could talk privately.  Defendant asked Agent Bourgeois to wait, went inside his house, came out with a group of people including his parents and led the agents into the house,

explaining that they could talk privately there.  Agent Bourgeois testified that he told Defendant that he was not under arrest and was not being detained and that the agents would leave at the conclusion of the interview.  Agent Bourgeois, however, did not specifically advise Defendant that he was free to leave.

Once they were all seated in the living room, Agent Bourgeois read Defendant his *Miranda* rights and asked if Defendant had any questions.  Agent Bourgeois also read the waiver of rights form which Defendant then signed.  Agent Bourgeois testified that Defendant indicated that he had no questions and no reservations about talking to the agents.  Agent Bourgeois then told Defendant that an autopsy had been performed on the baby and that it was clear that Defendant had not been truthful regarding how the baby was born and died.

According to Agent Bourgeois, without being asked many questions and without being informed of Ms. Begay's statement, Defendant told the agents that the baby had been born alive and that, while his initial inclination was to keep the baby, Ms. Begay told him that they could not keep it, that he had to do something with it and, finally, that he had to kill it.  Defendant told Agent Bourgeois that he got a knife from the kitchen and cut the baby's throat.  Agent Bourgeois testified that he never raised his voice or became belligerent with Defendant.  Further, Agent Bourgeois testified that Defendant's manner was reserved, resigned and matter-of-fact throughout the interview.

According to Defendant, Agent Bourgeois's "partner" told him that he was there that night and saw him kill the baby.[1]  Defendant testified that he said, "I didn't do nothing," but that the agents

---

[1]  During cross-examination by Assistant United States Attorney Miles Hanisee, Defendant indicated that it was Mr. Hanisee who told him that he saw Defendant kill the baby.

kept telling him that they saw him do it and that they would not let him leave until he said that he did it.  Accordingly, Defendant testified, he finally had no choice but to say, "Yeah, I did it."

Agent Bourgeois testified that he told Defendant that he would give him the opportunity to write a statement setting forth what he had told them.  According to Agent Bourgeois, he gave Defendant a pen and paper and told him to "write the truth."  Defendant wrote out his statement. Agent Bourgeois then read the statement aloud and had Defendant sign and date the statement. According to Defendant, his written statement was not true.

During cross-examination, Defendant admitted that he lied to the agents during each of the three interviews.  First, Defendant stated that, during the third interview, he made up that he killed the baby because the agents insisted that he had done it and that they had seen him do it.  Next, Defendant stated that, during the first interview, he made up that the baby was stillborn "just to get the FBIs out of [his] house."  Finally, Defendant stated that, during the second interview, he "did not want to tell the whole truth" because he had too many things on his mind at the time.

On June 14, 2004, Defendant filed the instant motion to suppress the statements that he made during each of the three interviews.  The government filed its response in opposition on June 24, 2004.  On August 31, 2004, the Court held an evidentiary hearing.  At the conclusion of the hearing, the Court took Defendant's motion under advisement.

## DISCUSSION

Defendant contends that, because the interviews by the agents constitute custodial police investigations for purposes of *Miranda*, the requirements of *Miranda* apply.  According to Defendant, the waiver of his *Miranda* rights was not voluntary and his statements thus were taken in violation of *Miranda*.  In addition, Defendant contends that his confession itself was not voluntary.  For both

of these reasons, Defendant argues that his statements must be suppressed.  As set forth herein, the Court disagrees.

## I.     *Miranda* Violation

  *Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436 (1966).  It is well-established, however, that "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Rather, the warnings required by *Miranda* apply only to "statements obtained from an individual who is subjected to custodial police interrogation." *Miranda*, 384 U.S. at 439.  Thus, the threshold question is whether Defendant was in custody for purposes of *Miranda* during the interviews by the agents.

### A.     Whether Defendant was "in custody"

  The Supreme Court has held that a person has been taken into police custody whenever he or she has been "deprived of his [or her] freedom of action in any significant way." *Id*. at 444.  The relevant inquiry is whether "a reasonable [person] in the suspect's position would have understood his [or her] situation . . . as the functional equivalent of formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  The court is instructed to determine: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The fact that an officer gives a *Miranda* warning "does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation." *United States v. Erving L.*, 147 F.3d 1240, 1247 n.5 (10th Cir. 1998) (citation omitted).

For example, in *Erving L.*, law enforcement officers went to the home of the juvenile defendant in order to question him about a report that he had sexually assaulted his cousin. The officers arrived in plain clothes and an unmarked car in the middle of the afternoon. They sat down in the living room with the defendant and his parents, explained what had been reported and asked for permission to talk to the defendant, which his parents granted. Initially, the defendant did not respond to the officers' questions but instead sat in silence and began to cry. The officers stated why they were there and explained that they wanted to hear the defendant's version of the story. Again, the defendant did not respond. When one of the agents handed the defendant a note pad and a pen and asked him to write down his thoughts, the defendant just held the pad and pen in silence. The agent explained that the defendant was not in custody and was not going to be arrested after their discussion no matter what he told them. The agent asked the defendant to read aloud in English from an advice of rights form, which the defendant did. The agent then asked if there was anything in the form that the defendant did not understand. The defendant asked for an explanation of the words "advice" and "coercion". The officers explained the words in English and Navajo. The defendant then said that he understood the form and signed the waiver provision. His parents, who were there during the interview, also signed it. The agent told the defendant that it was important for him to tell the truth and that they wanted to hear his side of the story. The defendant started recounting his story but at the point in the story when he was alone with his cousin, he stated that he did not want to talk anymore and began to cry. His mother told him that he should cooperate and that it would help him to clear his conscience. She offered to leave the room if it would make him feel more comfortable. Once his mother left the room, the agent moved next to the defendant in the place where his mother had been sitting. The defendant testified that, at that point, he was scared and wanted to go. The

agent asked the defendant to continue where he had left off.  The defendant related the remainder of the incident, continuing to cry as he talked.  The discussion with the officers out of the presence of his parents lasted for five to ten minutes.  The entire interview lasted for approximately one hour.

Based on these facts, the Tenth Circuit concluded that "the actions of the officers in this case would not cause a reasonable person in E.L.'s position to believe that his liberty was restrained to the degree associated with formal arrest." *Id.* at 1247.  The Tenth Circuit explained:  "The environment was not police-dominated, the officers were courteous and non-threatening, E.L. was specifically informed that he had the right to refuse to answer the officers' questions, and E.L. and his parents were told that E.L. would not be arrested regardless what he said." *Id.* at 1248.  The Tenth Circuit further found that the defendant's limited capacity to understand and other particular personality traits were "not relevant under the objective standard applicable here unless the officers were aware of E.L.'s particular traits **and** those traits influenced the actions of the officers." *Id.* (emphasis in original).  Accordingly, the Tenth Circuit held:

> Because the district court did not find that the officers were aware of E.L.'s particular traits or that the officers adjusted their tactics in response to E.L.'s idiosyncrasies and because neither of those findings can be fairly inferred from the record, E.L.'s idiosyncrasies are not relevant to this court's determination of whether he was in custody for *Miranda* purposes.

*Id.*

In the instant case, Defendant contends that he was in custody for purposes of *Miranda* during each of the three interviews.  With regard to the first interview, Defendant argues that he was awakened in the middle of the night, transported to Ms. Begay's home by Officer Antonio, prohibited from traveling with his parents and, once at Ms. Begay's home, prohibited from leaving until questioned by the agents one hour and forty minutes later.

-11-

The testimony presented at the hearing established that Officer Antonio arrived at Defendant's home between 10:30 p.m. and 11:00 p.m.  Defendant's testimony was inconsistent regarding whether Officer Antonio refused to let him ride to Ms. Begay's home with his parents.  Indeed, it is unclear from his testimony whether Defendant even asked Officer Antonio whether he could ride with them. As set forth above, Defendant first testified that he decided to go with Officer Antonio rather than ask if he could go with his family because he "felt like" she did not want him to go with his family, although she did not say that she did not want him to go with his family or that he was not allowed to go with his family.  It was only upon further questioning that Defendant testified that he asked Officer Antonio if he could ride with his parents and that she told him, "No, you have to go with me." In contrast, Officer Antonio testified that she asked Defendant if he wanted to ride with her and he said, "Okay."  The Court found Officer Antonio's testimony credible.  Agent Bourgeois, whose testimony the Court also found credible, testified that he began interviewing Defendant between 11:30 and midnight.  Between the time that Defendant and Officer Antonio arrived at Ms. Begay's house and the time of the interview, Defendant spent approximately twenty minutes talking with CI James in his vehicle and the remainder of the time waiting in his parents' car.  Both Officer Antonio and CI James offered credible testimony that they asked Defendant to stay and wait for Agent Bourgeois to arrive.  Although neither Officer Antonio nor CI James told Defendant that he was free to leave, neither one used threats or force to convince Defendant to stay, Defendant was not handcuffed, no sirens or lights were engaged, Officer Antonio advised Defendant that he was not being detained or arrested and Defendant sat in the front passenger seat in both Officer Antonio's and CI James's police vehicles.  Officer Antonio testified that she would have stopped Defendant if he tried to leave.  CI James testified that he would have let Defendant leave if he had attempted to do

so.  Defendant testified that both agents told him to stay and that he did not feel that he had a choice to leave.  Defendant, however, also testified that he wanted to cooperate with the agents and let them know what was really going on.  Moreover, Defendant testified that he wanted to stay and give the agents the information that he thought would help.

Taken as a whole, the credible evidence presented at the hearing[2] demonstrates that, despite the fact that none of the agents told Defendant that he was free to leave, "the atmosphere surrounding the interrogation here was far from the type of 'police-dominated' atmosphere identified as custodial in *Miranda*."  *Erving L.*, 147 F.3d at 1247.  The environment of the interview was not police-dominated, Officer Antonio and CI James were courteous and non-threatening and Defendant was informed that he was not being detained or arrested.  Given these circumstances, the Court cannot conclude that a reasonable person in Defendant's position would have felt that he or she was not at liberty to leave.

With regard to the second and third interviews, Defendant contends that he was required to accompany the agents to locations away from his family so that he could "tell the truth," that the agents failed to inform him that he was free to leave and that he did not believe that he was free to leave.  In addition, with regard to the third interview, Defendant argues that the agents advised that they would not leave until he confessed.

The evidence at the hearing established that, before the second interview,  Agent Bourgeois and CI James approached Defendant, who was in a waiting room at the hospital with his parents visiting Ms. Begay. Agent Bourgeois presented credible testimony that he and CI James asked

_____

[2]In making its credibility determinations, the Court has taken into account the internal contradictions in Defendant's testimony in addition to Defendant's admissions that he lied to the agents during each of the three interviews.

Defendant if they could speak with him again to clear up some of the facts regarding the baby. According to Agent Bourgeois, he told Defendant that he was not under arrest and was not being detained but that the agents wanted to question him in private.  Agent Bourgeois told Defendant that he needed to tell them the truth this time and indicated that he did not believe that Defendant's first version of the events surrounding the baby's birth and death was truthful.  Agent Bourgeois did not advise Defendant that he was free to leave and Defendant testified that, if he had tried to leave, he felt that the agents would have stopped him.  Nonetheless, Defendant agreed to go with the agents to another waiting area where there was more privacy.  At no point did Defendant tell the agents that he did not want to talk to them.  Moreover, Defendant testified that he wanted to clear up what happened to the baby once and for all.

The evidence presented at the hearing showed that, before the third interview, Agent Bourgeois, CI James and Agent McCaskill went to Defendant's house, where they found him outside with a group of people.  Agent Bourgeois told Defendant that they needed to talk to him and asked if there was somewhere they could talk privately.  Defendant asked Agent Bourgeois to wait, went inside his house, came out with a group of people including his parents and led the agents into the house, explaining that they could talk privately there.  Agent Bourgeois testified that he told Defendant that he was not under arrest and was not being detained and that the agents would leave at the conclusion of the interview.  Agent Bourgeois, however, did not specifically advise Defendant that he was free to leave.

Agent Bourgeois testified credibly that he told Defendant that an autopsy had been performed on the baby and that it was clear that Defendant had not been truthful regarding how the baby was born and died.  According to Agent Bourgeois, without being asked many questions and without

being informed of Ms. Begay's statement, Defendant made a statement admitting to killing the baby. Agent Bourgeois presented credible testimony that he never raised his voice or became belligerent with Defendant. Agent Bourgeois also credibly testified that he told Defendant that he would give him the opportunity to write a statement, gave Defendant a pen and paper and told him to "write the truth." Defendant wrote out his statement and signed and dated it.

In conflict with Agent Bourgeois's testimony, Defendant testified that Agent Bourgeois's "partner" told him that he was there that night and saw him kill the baby. This allegation, however, was not in Defendant's moving papers. Defendant further testified that he said, "I didn't do nothing," but that the agents kept telling him that they saw him do it and that they would not let him leave until he said that he did it. According to Defendant, he felt he had no choice but to say, "Yeah, I did it." On cross-examination, however, Defendant provided conflicting testimony that at the third interview, he wanted to clear up what happened to the baby once and for all and that is what he did.

As with the first interview, the credible evidence presented at the hearing demonstrates that the second and third interviews were not so "police-dominated" as to amount to custodial interrogations under *Miranda*. Again, although the agents did not inform Defendant that he was free to leave, they did inform him that he was not being detained or arrested. Defendant was not subjected to physical force or the threat of force. The agents were polite, spoke in an even tone of voice, never told Defendant that he was or would be charged with a crime, never displayed any weapons and were dressed in plain clothes. The circumstances surrounding these interviews thus do not rise to the level necessary under the case law to warrant a determination that a reasonable person in Defendant's position would have understood his situation as the functional equivalent of formal arrest.

Accordingly, Defendant was not in custody for purposes of *Miranda* during any of the three interviews. The agents thus were not required to administer *Miranda* warnings to Defendant.  It follows that Defendant cannot argue that his rights under *Miranda* were violated.

**B.      Waiver of Defendant's *Miranda* Rights**

Even if the Court were to determine that Defendant was in custody for purposes of *Miranda* and thus was subject to custodial interrogation, his arguments under *Miranda* would not succeed. The case law is clear that a defendant's statements may not be used against him unless the government shows that he voluntarily, knowingly and intelligently waived his *Miranda* rights.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden of proving a valid waiver by a preponderance of the evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The Supreme Court has held that the Court's inquiry into the validity of a waiver of *Miranda* rights has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. 412, 421 (1986).  A determination of whether the waiver of *Miranda* rights is voluntary, knowing and intelligent thus is based on the totality of the circumstances.  This standard is applicable even where the defendant is a juvenile.  *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  Under this approach, the Court must examine "several factors including the characteristics of the suspect, such as his [or her] age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his [or her] rights, the length of the

-16-

detention and the interrogation, and the use or threat of physical force." *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998), *cert. denied*, 525 U.S. 1167 (1999).

With regard to the requirement that a defendant's waiver be knowing and intelligent, the Supreme Court has explained that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Rather, a defendant's waiver is "knowingly and intelligently made" if the defendant "understood that he had the right to remain silent and that anything he said could be used as evidence against him." *Id.*

In the instant case, Defendant contends that he was incompetent to validly waive his *Miranda* rights. In support of this contention, Defendant states that he was eighteen years old at the time of the alleged offense; his school records revealed difficulties in the areas of written language and math, difficulties listening and understanding oral instructions and behavioral problems; he was in special education classes; and his IQ was only 72, correlating with borderline mental retardation.

Dr. Gerald Fredman, M.D., performed a psychological evaluation of Defendant and prepared a written report. In his report, Dr. Fredman states that he asked Defendant to read each statement on the *Miranda* advice of rights form during their interview and that Defendant was able to do so. The report states that, according to Defendant, the agents read these statements to him quickly and he did not read them himself. The report further states that Defendant had a basic understanding of his right to remain silent, that anything he said could be used against him in court and that he could stop answering at any time. The report, however, states that there was confusion and misunderstanding about Defendant's right to have a lawyer present and the right to have a lawyer appointed by the court. Specifically, the report states that Defendant believed that he would have to

obtain his own attorney and his reasoning was that he could not afford an attorney and did not want

his parents to wait for a long period.  The report sets forth Dr. Fredman's opinion as follows:

> It is my opinion that Mr. Tom has sufficient present ability to consult with his attorney
> with a reasonable degree of rational understanding and that he has a rational as well
> as factual understanding of the charges against him.  It is further my opinion that his
> waiver of rights was voluntary and knowing.  However, it is my opinion that the
> waiver was not an intelligent waiver.  Given his borderline intelligence and learning
> disorder, it is more likely than not that he did not grasp the significance of information
> provided by the Miranda warnings.

Dr. Fredman's Report at 11.  At the hearing, Dr. Fredman provided testimony consistent with his

report and reiterated his opinion that Defendant's waiver was voluntary and knowing but that,

because of Defendant's borderline mental retardation, he was unable to grasp the significance of the

information provided in the *Miranda* warnings and his waiver thus was not intelligent.

Based on the case law, the fact that Defendant's cognitive abilities may have been limited

alone does not render his waiver ineffective.  *See Smith v. Mullen*, No. 02-6055, 2004 WL 1690269

(10th Cir. July 29, 2004) (holding that while the defendant's intellectual functioning was limited and

his cognitive abilities mirrored that of a twelve year old, his waiver was not ineffective where he

stated his understanding of the *Miranda* rights, comprehended the questions the officers presented

and provided an accurate description of the crimes and the crime scene).   When asked on cross-

examination if he understood when Agent Bourgeois told him that he had the right to remain silent

and stop asking questions, Defendant replied, "Kind of.  Not really."   Upon further questioning,

Defendant admitted that he would understand if the prosecutor were to say to him, "you do not have

to answer my question right now."  Defendant testified that he did not understand this same statement

when Agent Bourgeois read it to him from the *Miranda* warnings during the three interviews because

he had a lot on his mind.  This is simply not a credible explanation, especially in light of Defendant's

own expert's report, which concludes that Defendant had a basic understanding of his right to remain silent, that anything he said could be used against him in court and that he could stop answering at any time. Thus, based on Defendant's own testimony and on his expert's opinion, the Court cannot conclude that Defendant was unable to understand the basic privilege guaranteed by the Fifth Amendment, *i.e.*, that he had the right to remain silent and that anything he said could be used as evidence against him.

Moreover, evidence presented at the hearing established that Defendant was a senior in high school, where classes were taught in English and Navajo. While Defendant testified that he sometimes had trouble understanding English, he also testified that he understood the prosecutor and his questions and that he had no trouble writing out his written statement for Agent Bourgeois. Specifically, Defendant testified that he was able to write the one and one-half page statement without any assistance in approximately ten minutes. Agent Bourgeois testified that "there was absolutely no question" that Defendant was fluent in English. Agent Bourgeois also testified that he had no indication that Defendant was special needs or was so slow that he did not understand what was going on.

Evidence presented at the hearing also showed that Defendant did not ask any questions about the waiver of rights before signing the waiver of rights form during each interview. Agent Bourgeois's testimony established that, during the third interview, after Agent Bourgeois read the waiver of rights form, Defendant indicated that he had no questions and no reservations about talking to the agents. According to Agent Bourgeois, Defendant appeared to understand what he was saying when Agent Bourgeois read the advice of rights and the waiver of rights and Defendant remained calm and unemotional. Moreover, Agent Bourgeois testified that he had no indication that Defendant

did not understand him or did not understand what was going on during any part of the interviews. Further, during each interview, Defendant provided a lucid description of the events surrounding the birth and death of Ms. Begay's baby and, after the first interview, accurately led the agents to the location where he put the baby.

In addition, evidence presented at the hearing demonstrated that the length and nature of the questioning was appropriate and lasted only for short periods of time. Moreover, it is undisputed that Defendant was advised of his constitutional rights in writing and was not subjected to physical punishment. The agents were polite, spoke in an even tone of voice, never told Defendant that he was or would be charged with a crime, never displayed any weapons, were dressed in plain clothes and never threatened Defendant. Accordingly, the totality of the circumstances surrounding the interviews reveals that Defendant made an uncoerced choice and had the requisite level of comprehension to validly waive his *Miranda* rights.

## II.   <u>Voluntariness of Confession</u>

Defendant contends that, regardless of whether he was entitled to a *Miranda* warning and whether his waiver of *Miranda* was valid, his confession was involuntary and thus must be suppressed. A confession made by a defendant to law enforcement officers is admissible only if it is voluntary. *See Flores*, 313 F. Supp.2d 1188, 1200 (D. Utah 2004). The government bears the burden of establishing by a preponderance of the evidence that the defendant's confession was voluntary. *See id.* A confession is involuntary if "the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'" *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)).

In evaluating the voluntariness of a confession, the Court must examine the totality of the circumstances to determine whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Erving L.*, 147 F.3d at 1248-49.  The following factors are relevant to this determination:  "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court clarified this totality of the circumstances test, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167.  The Tenth Circuit subsequently held: "it is clear after *Connelly* that a confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will." *Erving L.*, 147 F.3d at 1249.  Based on *Connelly*, "the Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect." *Flores*, 313 F. Supp.2d at 1200.  *See Erving L.*, 147 F.3d at 1249 (providing that "[defendant's] age, mental capacity, and personal idiosyncrasies are relevant only if this court first concludes that the officers' conduct was coercive," and concluding that given the officers' courteous and non-threatening behavior, the confession of a thirteen year old with a borderline IQ was voluntary); *United States v. Robertson*, 19 F.3d 1318 (10th Cir.) (concluding that defendant's

confession was voluntary even though it was given in the hospital after waking from a coma following a car accident), *cert. denied*, 513 U.S. 906 (1994); *Nickel v. Hannigan*, 97 F.3d 403, 41 (10th Cir. 1996) (holding that even in cases where a defendant is mentally impaired and the officer is aware of the impairment, a confession will be suppressed as involuntary only if the officer uses coercive measures to take advantage of the impairment), *cert. denied*, 520 U.S. 1106 (1997).

In determining whether, under the totality of the circumstances, Defendant's confession was voluntary, the Court herein first must determine whether the agents who interviewed Defendant engaged in "coercive police activity." The coercive elements of the interviews which Defendant details in his papers are as follows. First, Defendant contends that, early on the morning of August 29, 2002, he was awakened in the middle of the night, transported to Ms. Begay's home by Officer Antonio, prohibited from traveling with his parents and, once at Ms. Begay's home, prohibited from leaving until questioned by the agents one hour and forty minutes later. Next, Defendant contends that, during that interview, the agents told him that they would only let him go home if he told the whole story and that, if he did, he likely would go to a program rather than to jail. Defendant further contends that, on the afternoon of August 29, 2002, the agents told Defendant that his first version of the events was not truthful and that he needed to tell the truth this time and that the agents then required Defendant to accompany the agents to locations away from his family so that he could "tell the truth," never informing him that he was free to leave. Finally, Defendant argues that, on the afternoon of August 30, 2002, the agents advised that they would not leave his house until he admitted that he killed the baby, wore him down until he felt that he had no choice but to admit that he killed the baby and forced him to put the confession in writing.

As set forth above, credible evidence presented at the hearing calls into question several of these allegations. For example, Officer Antonio arrived at Defendant's home between 10:30 p.m. and 11:00 p.m., not early in the morning or in the middle of the night. Similarly, it is not clear even from Defendant's own testimony that Officer Antonio disallowed Defendant from riding with his parents to Ms. Begay's home or forced him to ride with her. In addition, Officer Antonio and CI James testified that they *asked* Defendant to wait with his parents until Agent Bourgeois arrived and Defendant himself testified that he wanted to stay and give the agents the information that he thought would help. Further, while Defendant testified that one of the agents told him that, if he told the truth, he would go to "some program instead of jail time," Defendant could not remember during which of the three interviews this statement was made. In contrast, Agent Bourgeois testified that Defendant never asked and he never mentioned anything about possible charges, incarceration or jail time. Finally, while Defendant testified that, during the third interview, Agent Bourgeois's partner told him that he was there that night and saw him kill the baby and that the agents would not let him leave until he admitted to having killed the baby, Defendant later testified that he wanted to clear up what happened to the baby once and for all and that he did that. Moreover, Agent Bourgeois presented credible testimony that Defendant admitted to having killed the baby without being asked many questions and without being advised of Ms. Begay's statement that he had killed the baby.

Some of Defendant's allegations are supported by credible evidence. Specifically, Agent Bourgeois, Officer Antonio and CI James all admitted that they never told Defendant that he was free to leave. In addition, Agent Bourgeois testified that he told Defendant that an autopsy had been performed on the baby and that, based on the results, it was clear that Defendant had not been truthful about how the baby was born and died. Finally, Agent Bourgeois did ask Defendant to speak with

-23-

the agents in private.  Under the relevant case law, however, these actions and omissions do not constitute "coercive police activity."  Moreover, even if the Court accepted as true the remainder of Defendant's allegations, these allegations would not rise to the level of "coercive police activity."

This is true regardless of whether Defendant is impaired due to his age and low intelligence level.[3]  The case law is clear that mental impairments such as those suffered by Defendant are relevant to the voluntariness determination only if the investigating officers exploited Defendant's mental impairments.  There was no evidence presented at the hearing to show that the agents exploited any of Defendant's perceived weaknesses in order to coerce the confession.  Indeed, Agent Bourgeois testified that there was no question that Defendant was fluent in English and that he had no indication that Defendant was special needs or so slow that he did not understand what was going on during the interviews.   Accordingly, the Court does not find that the agents used "coercive activity to undermine [Defendant's] ability to exercise his free will."  *Erving L.*, 147 F.3d at 1249.  Defendant's confession thus cannot be considered involuntary.

## CONCLUSION

The three interviews of Defendant by Agent Bourgeois do not constitute custodial police investigations for purposes of *Miranda*.  Accordingly, the requirements of *Miranda* do not apply. Even if the requirements of *Miranda* did apply, Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent.  For this reason, his statements were not taken in violation of *Miranda*.  Finally, Defendant's confession itself was not involuntary.

---

[3]  As set forth above, Defendant argues that he was mentally impaired due to the following factors:  he was only eighteen years old at the time of the alleged offense; his school records revealed difficulties in the areas of written language and math, difficulties listening and understanding oral instructions and behavioral problems; he was in special education classes; and his IQ was only 72, correlating with borderline mental retardation.

**IT IS THEREFORE ORDERED** that Defendant Charlie Tom, Jr.'s Motion to Suppress

Statements and Memorandum in Support **[Doc. No. 78]** is hereby **DENIED**.


Dated this 29th day of December, 2004.


_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


<u>Attorney for Plaintiff</u>:
Marron Lee

<u>Attorney for Defendant</u>:
Robert Cooper